**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 24, 2019**

# In the Court of Appeals of Georgia

A19A0491, A19A0873. THE STATE v. PARKS; and vice versa.

GOBEIL, Judge.

In this appeal and cross-appeal, the State appeals from the Superior Court of Gilmer County's order granting Daniel Franklin Parks a new criminal trial (Case No. A19A0491). Specifically, the State contends that, in granting the motion for a new trial, the lower court[1] erred when it: (1) ruled that the trial court erred by allowing in evidence of Parks's polygraph refusal; (2) ruled that the polygraph examiner should not have been able to testify through video as to the pre-test interview; (3) ruled that the trial court improperly excluded evidence of K. P.'s prior false allegation; and (4)

---

[1] The judge that heard the motion for new trial was not the same judge that presided over the trial. Therefore, consistent with the parties' briefs, references to the "reviewing court" refer to the proceedings related to the motion for new trial, and references to the "trial court" refer to the trial proceedings.

raised and commented sua sponte on the alleged inappropriate comments by the State in its opening statement and the issue of whether Parks waived his right to be present at bench conferences.

Parks cross-appeals from the same order, arguing that, the trial court erred in admitting at his trial other acts evidence relating to an uncharged anal sodomy allegation (Case No. A19A0873). For the reasons set forth below, we affirm in part, and reverse in part.

The facts related to this appeal, show that, in 2013, Parks was indicted in the Superior Court of Gilmer County on charges of aggravated child molestation, sodomy (oral), and contributing to the delinquency of a minor based on acts that occurred on July 25, 2012. The case proceeded to a jury trial in 2014.

Prior to the trial, Parks filed a motion to allow him to present evidence and/or question the complaining witness, K. P., regarding prior false allegations of rape and child molestation made by her. At the pretrial hearing on this motion, K. P.'s brother, T. P., then age 23, testified that approximately four years prior, when K. P. was 11 years' old, she accused him of inappropriately touching her. T. P. testified that the allegations were not true and he took a polygraph and passed it, and no charges were ever brought against him. On cross-examination, T. P. could not recall what the

2

nature was of the inappropriate touching allegation. T. P. testified that K. P. was raped by someone a few months before she made the allegations against him. He acknowledged that K. P. had a change in personality after the rape and would do things to get attention. The State informed the court that the rape had been committed by a stranger and that the perpetrator had been prosecuted and convicted. On redirect examination, T. P. acknowledged that as a result of the inappropriate touching allegation, the Division of Family and Children Services ("DFCS") conducted an investigation, but "nothing ever became of that."

Despite attempts to refresh her recollection, K. P. (then age 16), testified that she did not remember previously making any allegation against her brother. Following argument by both parties, the court held that this evidence would not be allowed at trial for the following reasons: (1) it was a "non-specific comment as to inappropriate touching which could fall into other categories other than the inappropriate sexual contact as required by the [OCGA § 24-4-412]"; (2) given the context of everything happening in K. P.'s life at the time and the non-specific nature of the comment, it did not "rise to the level of a true false allegation as contemplated by [OCGA § 24-4-412] which would show somebody's reputation for untruthfulness about something that critical"; and (3) the court was concerned that allowing in

3

T. P.'s testimony that he took a polygraph test and passed would harm Parks, because it might "misdirect" the jury and cause them to give too much weight to the fact that Parks declined to take a polygraph.

At trial, K. P., who was 14 years old at the time of the alleged offenses, testified that, on July 25, 2012, Parks, who was a friend of K. P.'s mother and the mother's boyfriend, came over to K. P.'s house while her mom was at work. Prior to Parks's visit, he and K. P. had been talking to and texting one another. During one of these conversations, K. P. disclosed that she had tried drugs with her boyfriend, which she testified was information she did not want her mother to know because she was "scared of her [mother's] opinion." K. P. testified that she met Parks outside when he arrived and they went inside the house and sat on the couch in the living room. She stated that Parks "placed his hand on [her] knee" for a few seconds, but then indicated that he was ready to leave, so she walked him back outside. After they got outside, Parks grabbed K. P.'s arm, and asked her if she wanted him to tell her mother that she had done drugs. K. P. responded "no," and Parks gave her a "weird little smile" and "looked like he wanted something." K. P. stated that Parks then pulled his penis out of his pants, and asked her to perform oral sex on him, or else he would tell her mother that she had tried drugs. K. P. then performed oral sex on Parks,

4

during which time, Parks placed his hands on the back of K. P.'s head and moved her head back and forth. While K. P. was performing oral sex on Parks, her older brother saw what was happening and started banging on the window, and Parks pushed K. P. to the ground, got in his truck, and left. K. P. asked her brother not to tell their mother what had happened.

K. P. testified that, a few days later, on July 30, 2012, she asked Parks to give her a ride to a friend's house and he agreed. During the ride, they discussed what happened at her house a few days earlier, but K. P. could not remember any details of the conversation or who started the conversation. Instead of taking her to her friend's house, Parks pulled into a local park, grabbed her leg, flipped her over onto her stomach, pulled down her pants and underwear, and forcibly stuck his penis inside her anus.[2] Parks's counsel objected to this testimony on the grounds that it was

---

[2] In addition to K. P.'s testimony regarding the alleged anal sodomy on July 30, 2012, Deputy Sheriff Christopher Hughes testified that he responded to a runaway juvenile call concerning K. P. on July 30, 2012, and when he later found K. P. at another family member's home she was crying hysterically, the paramedics were called, and K. P. reported that she had been raped. Additionally, an EMT that responded to the call testified that when she arrived, K. P. was "cowering" in a corner and was "hysterical." K. P. eventually calmed down and told the EMT that an older man named "Chris," picked her up in a white truck, drove her to the park and raped her. Finally, one of the detectives in the case testified that K. P. told him that Parks picked her up to give her a ride around 10 p.m. on July 30, 2012, stopped at a local park, ripped off her pants and anally sodomized her, and afterwards, smashed her cell

5

not relevant because Parks was not charged with anything that allegedly occurred on July 30, 2012. The State maintained that the events were connected and went to "continuing course of conduct." The trial court initially reserved ruling on the issue, but ultimately overruled the defense's objection, concluding that it was for the jury to determine whether the two events were "properly connected."

K. P. testified that, after the rape, she tried to use her phone to call her mom, but Parks took the phone and smashed it with a rock and hit K. P. on the forehead with a rock. K. P. then got out of the truck and went and hid underneath a bridge until Parks left. After Parks left, K. P. went to her grandmother's house, and her grandmother called the police. K. P. admitted that she initially lied to authorities and did not tell them that it was Parks because she was afraid of him. That night, K. P.'s brother told her mother what had happened between K. P. and Parks at their house a few days prior.

On cross-examination regarding the incident on July 25, K. P. stated that she could not remember where Parks's truck was, which direction it was parked, or where she and Parks were standing in the driveway when she performed oral sex on Parks. She stated that, when Parks came to her house that day, her brother was home but was

phone.

6

taking a nap, although she did not remember where he was napping. She denied that she had run away from home on July 30. She acknowledged that she spoke with an EMT on July 30 after the police were called to her grandmother's house and remembered telling the EMT that she was picked up and raped by a man named Christopher who drove a white truck, which she admitted was a lie. She did not remember any more details about what she may have said to the EMT or anyone at the hospital.

K. P.'s brother, T. P., testified that, on July 25, 2012, he was taking a nap before work, and K. P. told him she was going outside to talk on the phone. T. P. was napping on the living room couch when a truck engine woke him up, and he went to his parents' bathroom, stood up on the sink, and looked out of the window, which is when he saw K. P. performing oral sex on Parks against the passenger side of Parks's truck. T. P. stated that Parks's hands were on top of K. P.'s head. T. P. started banging on the window and yelling and ran outside to confront Parks, but by the time he got outside, Parks was speeding away in his truck. T. P. testified that he never heard or saw anyone come into the house. T. P. stated that he wanted to call the police, but K. P. wanted to keep it a secret. However, he testified that he told his mother about the incident "a few weeks later" when "the other stuff happened."

7

On cross-examination, T. P. confirmed that there were only two couches in their house and both of them were in the living room. T. P. acknowledged that, in his statement to police on July 30, 2012, he said that he observed K. P. and Parks against the driver's side of the truck, but he explained that he must have "mixed [it] up." He also confirmed that only a few days passed between the oral sex incident and when he gave his statement to police.

Pamela Rushton, an agent and polygraph examiner with the Georgia Bureau of Investigation, testified that she was contacted by an investigator with the Gilmer County Sheriff's Office to conduct a polygraph exam on Parks. Rushton testified that Parks came in voluntarily. Rushton explained that the first part of the polygraph procedure involves getting the individual to sign a waiver form advising the person of his or her *Miranda*[3] rights. Next, the examiner conducts a pre-test interview, during which the examiner reviews the allegations in the case (as relayed to her by law enforcement), the questions that will be asked, and explains the polygraph procedure/how the polygraph machine works to the individual. Rushton testified that she never completed a polygraph examination on Parks because, during the pre-test interview, Parks stated that he needed an attorney which ended the interview. A copy

_____

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LEd2d 694) (1966).

8

of the waiver of rights form and the consent to undergo a polygraph examination form, both signed by Parks, were admitted without objection. Rushton explained that the pre-test interview with Parks was recorded, and a copy of the interview was admitted into evidence without objection.[4] The recording of the approximately hour long pre-test interview was then played for the jury.

During the interview, Parks stated that he understood that he was being interviewed because he was being accused of rape, but he denied the allegations. Parks stated that he knew K. P. (although not well) through her mother, and that he had been to K. P.'s house on a few occasions.

For approximately the next 30 minutes, Rushton reviewed the allegations against Parks, gave her opinion on the case, explained Parks's options and pleaded with him to tell the truth. Parks did not speak during this time. Specifically, Rushton explained that she knew that Parks had denied all of the allegations against him, but

---

[4] Prior to trial, the State expressed its intention to introduce the pre-test interview at trial and requested a hearing to demonstrate that Parks's statement was freely and voluntarily given, pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LEd2d 908) (1964). At the hearing, Parks's counsel argued that the statement was not freely and voluntarily given. The trial court concluded that the statement was freely and voluntarily given, and the interview was admissible. Parks does not challenge this ruling on appeal, and he made no other objections to the admission of the interview at trial.

9

Rushton stated that she would expect him to say that regardless of whether he committed the rape because the human reaction is to shut down or retreat when threatened.

Rushton told Parks that he had "three options." First, if he had not participated in any type of sexual activity with K. P., including oral or anal sexual activity, then he should have no problem taking the polygraph test. Second, if he participated in any sexual activity with K. P., then Parks could walk out the door and not take the polygraph test (which the examiner stated was not a good option), or he could take the polygraph test and fail (which the examiner asserted was far worse than the acts of which Parks was accused, because it would irrevocably strip Parks of his integrity and Parks could never get that back). Third, if something had happened between Parks and K. P., Parks could give his side of the story. Rushton then cautioned that, if he planned on lying to her, he would "come up on the losing end" because she had been conducting polygraph examinations for 10 years and had conducted over 5,000 exams.

Rushton continued, further explaining that she had reviewed K. P.'s brother's statement that he witnessed K. P. performing oral sex on Parks. Rushton said that she asked the investigator why K. P.'s brother might have a reason to lie, and the

investigator could not give her a reason. Additionally, Rushton told Parks that she did not find his statement credible because she did not know many men who would get up at midnight to give someone a ride out of the "goodness of their heart." She also observed that it apparently took Parks two hours to give a ride that should have only taken fifteen minutes. Rushton further opined that Parks's statement "[did] nothing but corroborate [K. P.'s] story." Then Rushton suggested that, if something did happen between Parks and K. P., then maybe K. P. "came onto" Parks. Rushton stated, "I don't know if [K. P.] rubbed herself on you and got you sexually aroused. I don't know. I know there's two people that [do] know the complete truth, that [were] there, and that's you and [K. P.]. [She] says forced, you say absolutely nothing at all." Rushton encouraged Parks to admit something happened if it was a consensual act, because that would be better than the picture that was being portrayed of a "monster" that held K. P. down and forced her to do something that she did not want to do.

Next, Rushton explained to Parks that because he denied any sexual activity occurred, she would be using the polygraph test to determine whether any sexual activity occurred between the two of them. Rushton then stated, "my question is are you prepared to take a polygraph test on those questions" solely regarding whether

any sexual activity occurred, and advised Parks that if he could answer "no" to those questions then he would pass the test. However, Rushton informed Parks that based on 20 years of law enforcement experience, she saw "red flags all over [his] story." Rushton also noted that, if she had issues with his story as a law enforcement officer, then Parks should imagine "what 12 mamas and daddies sitting on [a] jury [are] go[ing to] say when they bring [K.P.] out there and put her on that stand and she starts crying and talking about how you forced her to do something that she didn't want to do." Although Rushton informed Parks that "the choice [was his]," she advised him that, if something had happened between him and K. P. then his "best option" was not to take the polygraph because he would fail the test and instead he should admit to the investigator that something happened and explain his side of the story.

Rushton also opined that the whole truth had not been told. At that point, Parks responded, stating that he did not know what to say, and that he and K. P. never had sex, but that she "tried" to at her house. Rushton stated that if Parks wanted her help then he needed to tell her the whole truth not just "a little bit" of the truth. She then told Parks that she knew Parks's was not telling the truth when he said that K. P. tried to have sex with him and he said no because, if that was true, then there was "no way in hell" that Parks would have gone to pick K. P. up at midnight and put himself in

12

a potentially compromising situation. In response, Parks stated that he was telling the truth and that he simply picked K. P. up and dropped her off and he denied any sexual activity occurred between the two of them.

Parks also admitted to Rushton that he went to K. P.'s home on July 25, 2012, because he thought K. P.'s mom was home. He stated that K. P. came outside and they talked for a bit and then her brother came out and they talked for a bit but then her brother went back inside. Parks claimed that before he left, K. P. offered to perform oral sex on him and tried to unzip his pants. Parks asserted that he said no, and K. P. got mad. Rushton then told Parks she did not believe that he raped K. P., but that she did believe that K. P. had manipulated him and something inappropriate happened between them. At that point, Parks stated that he thought he needed an attorney, and the interview ended.

Following the playing of the interview for the jury, Rushton admitted on cross-examination that she had not personally done any investigation in the case. Rather, she acknowledged that all of the information regarding the case that she discussed with Parks in the interview was information she learned from the investigators in the case and from reviewing the incident report. Thereafter, the State rested, and the defense rested without calling any witnesses. The jury convicted Parks of aggravated

13

child molestation and contributing to the delinquency of a minor, but acquitted him of the oral sodomy charge, and he was sentenced to life in prison.

Parks subsequently filed a motion for a new trial arguing in relevant part that the trial court erred when it: (1) admitted the other acts evidence related to the uncharged act of anal sodomy that allegedly occurred on July 30, 2012; (2) admitted in evidence that Parks refused to take a polygraph, and allowed the polygraph examiner to testify via video to information of which she had no firsthand knowledge and which she would not have been able to testify to from the witness stand; and (3) refused to allow in evidence of K. P.'s prior false allegations.

Following a hearing on the motion, the reviewing court granted the motion for a new trial, finding that the trial court erred in (1) allowing into evidence Parks's refusal to take a polygraph, and in allowing the polygraph examiner to testify via video to information of which she had no first hand knowledge and which she would not have been able to testify to from the witness stand; and (2) refusing to allow in evidence that K. P. had made a prior false allegation. However, the reviewing court found that the trial court did not err in admitting the other acts evidence because (although it was incorrectly admitted as evidence of continuing course of conduct) the alleged act was between the complaining witness and Parks, and was therefore

14

admissible under OCGA § 24-4-404 (b) ("Rule 404 (b)"). Additionally, although not asserted by Parks as grounds for granting a new trial, the reviewing court also found that the State made inappropriate comments in its opening statement regarding the other acts evidence. Finally, the reviewing court found that the bench conferences had not been transcribed and there was no evidence that Parks waived his right to be present during those bench conferences. Accordingly, the reviewing court granted Parks a new trial. These appeals followed.

In general, "[t]he first grant of a new trial shall not be disturbed by an appellate court unless the appellant shows that the judge abused his discretion in granting it and that the law and facts require the verdict notwithstanding the judgment of the . . . judge." OCGA § 5-5-50; *State v. Hill*, 295 Ga. 716, 718 (763 SE2d 675) (2014) ("[T]his Court will not disturb the first grant of a new trial on the general grounds in a criminal case unless the trial court abused its discretion in granting it[.]"). "[W]here, as in this case, the judge who hears the motion for a new trial is not the same judge as the one who presided over the original trial, the discretion of the successor judge is narrower in scope. Nevertheless, this Court is restricted to reversal of the grant of the new trial only if the successor judge abused his or her discretion." *State v. Harris*, 292 Ga. 92, 95 (734 SE2d 357) (2012) (citation and punctuation

15

omitted). However, "[w]hen a trial court grants a new trial on special grounds involving a question of law, we review the grant de novo and reverse if the trial court committed legal error." *State v. Wakefield*, 324 Ga. App. 587, 587 (1) (751 SE2d 199) (2013) (citations and punctuation omitted).

Where a party has objected to a trial court's evidentiary rulings at trial, we review the evidentiary rulings for an abuse of discretion. *Williams v. State*, 328 Ga. App. 876, 880 (1) (763 SE2d 261) (2014).

> A proper application of the abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach, and that there will often be occasions in which we will affirm the evidentiary ruling of a trial court even though we would have gone the other way had it been our call. That said, while the abuse-of-discretion standard presupposes a range of possible conclusions that can be reached by a trial court with regard to a particular evidentiary issue, it does not permit a clear error of judgment or the application of the wrong legal standard.

Id. (punctuation and footnotes omitted).

On the other hand, where a party fails to object to an evidentiary ruling at trial, we review such rulings for plain error. See OCGA § 24-1-103 (d) (providing that "[n]othing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the

16

attention of the court"); *Rainwater v. State*, 300 Ga. 800, 802 (2) & (n.3) (797 SE2d 889) (2017) (explaining that, under the new evidence code, we review unobjected to evidentiary rulings for plain error).

> In regard to a plain-error review of a ruling on evidence, the analysis consists of four parts. First, there must be an error or defect–some sort of deviation from a legal rule–that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the [defendant]. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the [defendant's] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error–discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Thus, beyond showing a clear or obvious error, plain-error analysis requires the [defendant] to make an affirmative showing that the error probably did affect the outcome below.

*Adams v. State*, 344 Ga. App. 159, 163 (1) (809 SE2d 87) (2017) (citation and punctuation omitted); see also *Gates v. State*, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016) (holding that "the same plain-error standard that we adopted in [*State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011)], with respect to jury charges also

17

applies to rulings on evidence").With these principles in mind, we turn to the arguments on appeal.

*Case No. A19A0491*

1. In two inter-related enumerations of error, the State argues that the trial court did not err in admitting as evidence Parks's refusal to take the polygraph examination, and in allowing the polygraph examiner to testify to information of which she had no firsthand knowledge (via the recording of the pre-test interview); and, the State argues that the reviewing court erred in holding otherwise. The State maintains that Parks waived both issues for purposes of appellate review because he failed to raise an objection at trial. We find no merit in the State's argument that we should not consider Parks's claims because he failed to object to the challenged evidence at trial. Parks's trial took place in 2014, and therefore the new Evidence Code applied. See *Olds v. State*, 299 Ga. 65, 69 (2) (n.5) (786 SE2d 633) (2016) ("The new Evidence Code applies in cases tried on or after January 1, 2013."). And, under the new Evidence Code, we review unobjected-to evidentiary rulings for plain error. See OCGA § 24-1-103 (d); *Rainwater*, 300 Ga. at 802 (2) & (n.3).

Further, the State contends that, even under plain error review, Parks is not entitled to relief because he relinquished/abandoned the issue by failing to object; to

18

the extent there was any error, it was not clear and obvious; and, he failed to show that the admission of the challenged evidence affected the outcome of the proceedings in light of the other evidence against him.

As an initial matter, under the first and second prongs of plain error review, we must determine whether it was error to admit the challenged evidence and whether such error was clear and obvious. *Adams*, 344 Ga. App. at 163 (1). With regard to the admission of testimony related to the fact that Parks refused to complete the polygraph examination,[5] it is well-established that "[e]vidence that a defendant entered into a stipulation to take a polygraph but later refused to do so is neither probative nor admissible. [And,] [i]t is error to allow evidence of a defendant's

---

[5] We find no merit in the State's argument that Parks's case is distinguishable from cases regarding a defendant's refusal to take a polygraph examination simply because Parks invoked his right to counsel (as opposed to outright refusing to continue with the examination). The State's argument too narrowly construes our precedent. To be clear, while the *results* of a polygraph test are admissible upon stipulation of the parties," evidence that [a defendant] entered into a stipulation to take the examination, but later refused to do so, is not probative and is not admissible." *Brown v. State*, 175 Ga. App. 246, 248 (4) (333 SE2d 124) (1985). This is true regardless of the language invoked by a defendant that results in his declining to take the examination or even if the defendant stipulates to admitting evidence of the refusal. Id. at 249 (4) (holding that evidence of a defendant's refusal to submit to a polygraph examination was inadmissible notwithstanding his written stipulation to admission of evidence of his refusal, which was "an attempt to change the law and . . . invalid").

19

refusal to submit to a polygraph examination." *Hall v. State*, 226 Ga. App. 298, 300 (2) (485 SE2d 800) (1997) (citations omitted); *Brown v. State*, 175 Ga. App. 246, 248 (4) (333 SE2d 124) (1985) (same). Thus, it was legal error for the trial court to admit evidence that Parks consented to take a polygraph examination, but later asked for an attorney and did not complete the polygraph examination. Moreover, in light of our clear, long-standing precedent barring the admission of polygraph refusals, we find that the error in admitting the challenged evidence was clear and obvious.

Similarly, a review of the recording of the pre-test interview admitted at trial reveals that, during the interview, the polygraph examiner testified to numerous facts related to both the charged crimes and the other acts evidence. However, the polygraph examiner admitted on cross-examination at trial that she had not personally done any investigation in the case. Instead, all of the knowledge regarding the case came from her discussions with the investigators and from reviewing the incident report. "It is axiomatic that a witness testifying as to the existence of a fact must testify from [her] own firsthand knowledge." *Green v. State*, 266 Ga. 237, 239 (2) (466 SE2d 577) (1996) (citations and punctuation omitted); see also *Dukes v. State*, 224 Ga. App. 305, 309 (4) (480 SE2d 340) (1997) ("[W]e find no authority which indicates that investigators may testify to the fruits of their investigations without

20

regard for the hearsay rule; rather such witnesses are bound by that rule and must testify from their own first-hand knowledge alone.") (citation and punctuation omitted). Thus, the polygraph examiner's testimony via the recorded interview as to what happened between Parks and K. P. and statements made by witnesses involved in the case was inadmissible because the examiner had no firsthand knowledge. Furthermore, through the video of the interview, the polygraph examiner was allowed to opine that Parks was lying when he denied that no sexual activity, including oral sex, occurred between him and K. P. However, "Georgia does not allow witnesses to opine that a party or victim is lying or telling the truth, for [the issue of credibility] is a matter solely within the province of the jury." *Shelton v. State*, 251 Ga. App. 34, 38 (3) (553 SE2d 358) (2001) (citation and punctuation omitted). Accordingly, we find that the admission of the polygraph examiner's testimony via the recorded interview was error, and that such error was clear and obvious.

However, even if obvious legal error is present, such error must not have been affirmatively waived. *Adams*, 344 Ga. App. at 163 (1). The State argues that Parks's claims fail on this ground alone because he failed to object to the challenged evidence at trial. We find no merit in this contention. Our Supreme Court has "cautioned that a 'waiver' in [the] context [of plain error review] differs from the 'forfeiture' that

21

results from the mere failure to timely assert a legal right." *Woodard v. State*, 296 Ga. 803, 809 (3) (a) (771 SE2d 362) (2015). For purposes of plain error review, "[a]n affirmative waiver requires the intentional relinquishment or abandonment of a known right," and the mere failure to object does not constitute such an affirmative waiver because it "is more appropriately described as a forfeiture[.]" *Cheddersingh v. State*, 290 Ga. 680, 684 (2) (724 SE2d 366) (2012). Accordingly, Parks did not affirmatively waive the issues before us, and the first and second prongs of the plain error test were met.

Next, the State argues that Parks failed to satisfy the third prong of the plain error test because he cannot show that the admission of the challenged evidence affected the outcome of the proceedings in light of the other evidence against him. We disagree. While "[r]eversal is not demanded on every occasion where a reference is made to polygraphs," we do not find that the challenged testimony was merely an insignificant reference to a polygraph or was cumulative of other evidence as the State contends. *Brown*, 175 Ga. App. at 249 (4). Not only was the polygraph examiner permitted to testify as to Parks's original willingness and later refusal to complete the polygraph examination, but as discussed above, on multiple occasions she implied that she believed that Parks was lying when he denied that any sexual

22

activity occurred with K. P. As in *Brown*, we find that "the testimony in the instant case is merely an attempt to raise an inference of [Parks's] guilt as a result of his subsequent refusal to take the polygraph." Id. at 248-249 (4). Furthermore, we agree with Parks that this testimony improperly bolstered K. P.'s testimony, was highly prejudicial to Parks (particularly, since he exercised his right not to testify on his own behalf), and probably affected the outcome of the proceedings. We also find that the fourth prong of plain error review is met, as this error seriously affected the fairness and integrity of the proceeding. Accordingly, we affirm the grant of a new trial on these grounds. *Adams*, 344 Ga. App. at163 (1).

2. Although we are affirming the grant of a new trial for the reasons discussed in Division 1, the reviewing court also found that a new trial was warranted because the trial court erred in excluding evidence of K. P.'s prior false allegation against her brother. The State argues that, contrary to the reviewing court's finding, the trial court properly excluded this evidence because Parks failed to establish that K. P.'s prior allegation was false. We agree and we therefore reverse the reviewing court's ruling on this ground.

In prosecutions for child molestation or sodomy, Georgia's Rape Shield statute prohibits testimony regarding a complaining witness's "past sexual behavior." OCGA

§ 24-4-412 (a). However, it does not prohibit testimony regarding previous false allegations by the complaining witness. *Smith v. State*, 259 Ga. 135, 137 (1) (377 SE2d 158) (1989) (holding that Georgia's Rape Shield statute, as it then existed under the old Evidence Code, did not prohibit testimony of prior false allegations made by a victim), overruled in part by *State v. Burns*, ___ Ga. ___ (2) (Case No. S18G1354, decided June 10, 2019) (overruling the constitutional holding in *Smith*, but holding that the "evidentiary holding in *Smith* is consistent with the decades-old plain language of the Rape Shield statute and remains good law in the era of the new Evidence Code"); see also *Morgan' v. State*, 337 Ga. App. 29, 31 (1) (785 SE2d 667) (2016) (recognizing that the new version of the Rape Shield statute does not prohibit false-allegation evidence), disapproved of by *Burns*, ___ Ga. ___ at (2) (n.3) (disapproving *Morgan* to the extent it relied on or cited the constitutional holding in *Smith*). Nevertheless, "before such evidence can be admitted, the trial court must make a threshold determination outside the presence of the jury that a reasonable probability of falsity exists." *Morgan*, 337 Ga. App. at 31 (1) (citation and punctuation omitted). "In this context, a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams v. State*, 266 Ga. App. 578, 580 (1) (597 SE2d 621) (2004) (citation and punctuation omitted). "The

24

defendant has the burden of coming forward with evidence at the hearing to establish a reasonable probability that the victim had made a prior false accusation of sexual misconduct." *Clements v. State*, 279 Ga. App. 773, 774 (2) (632 SE2d 702) (2006).

Here, prior to trial, Parks advised the trial court that he intended to present evidence of an alleged prior false sexual allegation made by K. P. against her brother. The trial court, as required, conducted a pretrial hearing and took testimony from T. P. and K. P., and heard argument from counsel about whether K. P.'s prior allegation of "inappropriate touching" was false. Notably, neither T. P. or K. P. could specify the exact nature of the "inappropriate touching" allegation or provide any details as to the nature of the allegation.[6] Indeed, K. P. did not remember making any allegation at all. Although Parks's counsel argued that "inappropriate touching" had to be of a sexual nature due to the fact that T. P. was asked to take a polygraph and DFCS conducted an investigation, this assertion is pure speculation.

Further, although T. P. testified that he took a polygraph examination in which he was questioned about the allegation and passed the polygraph, that does not per

---

[6] Specifically, when asked to specify what type of inappropriate touching was alleged, T. P. testfied that he "[did not] remember what the inappropriate [touching] was, [or] what [he was] being accused of, but all [he] [knew] is [that he] was being accused of it and [he] didn't do it[.]"

25

se establish a reasonable probability that the allegation was false. See *State v. Chambers*, 240 Ga. 76, 77 (239 SE2d 324) (1977) ("We acknowledge that doubt exists as to the complete reliability of lie detector tests, and we share at least a modicum of that doubt. Operators may be unskilled, and results may be ambiguous and subject to arbitrary characterization."). Similarly, the fact that T. P. stated that the allegation was false is not sufficient to establish a reasonable probability of falsity. See *Williams*, 266 Ga. App. at 580 (1) ("Of course, the fact that an accused states that the accusation against him is false is hardly evidence to raise a reasonable probability of falsity.") (citation and punctuation omitted). Likewise, the fact that no charges were brought against T. P. does not establish a reasonable probability that the allegation was false. Id. at 580-581 (1) (holding that the fact that the accused was never prosecuted "indicates only that insufficient evidence existed at the time for a charge to be brought; it does not address the truth or falsity of the accusation. . . . The fact that an accusation is not prosecuted is insufficient to establish its falsity."). Accordingly, in light of the evidence before the trial court, we do not find that the trial court abused its discretion in excluding this evidence at trial. Id. at 581 (1) ("[A] trial court's ruling on the admissibility of such evidence will not be overturned absent

26

an abuse of discretion.") (citation and punctuation omitted). Consequently, we reverse the reviewing court's ruling that this evidence is admissible.

3. In light of our holding in Division 1 that a new trial is warranted, we do not address the State's remaining enumerations of error (that the reviewing court erred in granting the motion for new trial when it addressed sua sponte allegedly inappropriate comments made during opening statements and the waiver of bench conferences issue), as these issues are not likely to recur at a new trial. See *Hobbs v. State*, 299 Ga. App. 521, 524 (3) (682 SE2d 697) (2009) (declining to address the appellant's remaining enumerations of error because they did not raise issues that were likely to recur at a new trial); see also *Beck v. State*, __ Ga. __ (2) (825 SE2d 184) (2019) ("[B]ecause [the appellant's] remaning enumerations of error relate to issues that are not likely to recur in the event of a retrial, we do not address them at this time.").

*Case No. A19A0873*

4. In his sole enumeration of error on cross-appeal, Parks argues that the trial court erred in admitting other acts evidence (the uncharged anal sodomy act that allegedly occurred on July 30, 2012) over his objection. We review the trial court's decision for abuse of discretion. *Williams*, 328 Ga. App. at 880 (1).

27

As set forth above, the new Evidence Code applied in this case. At the trial, the trial court admitted the other acts evidence over Parks's objection based on the State's argument that it demonstrated a continuing course of conduct. It is well-established that with regard to the admission of other acts evidence, "the 'course of conduct' and 'bent-of-mind' exceptions, formerly an integral part of our law of evidence, have been eliminated from the new Evidence Code." *Brooks v. State*, 298 Ga. 722, 727 (2) (783 SE2d 895) (2016). Accordingly, the trial court erred in admitting the challenged evidence as evidence of continuing course of conduct. Id. Nevertheless, the reviewing court determined that, although the trial court erred in admitting the other acts evidence as continuing course of conduct, the evidence was otherwise admissible under Rule 404 (b) "because the alleged act[] [was] between the complaining witness and [Parks]." .

Pursuant to Rule 404 (b),

[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon

28

good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

OCGA § 24-4-404 (b).

> For other acts evidence to be admissible [under Rule 404 (b)], a three-part test must be satisfied. The trial court must find that: (1) the other acts evidence is relevant to an issue other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice under OCGA § 24-4-403 ("Rule 403"), and (3) there is sufficient proof that a jury could find by a preponderance of the evidence that the defendant committed the acts.

*State v. Atkins*, 304 Ga. 413, 416 (2) (819 SE2d 28) (2018) (citations omitted).

At Parks's trial, the State articulated only its hypothesis that the other acts evidence was admissible to show continuing course of conduct, which, as discussed above, is no longer a qualifying exception for the admission of such evidence. The reviewing court concluded that the evidence was otherwise admissible under Rule 404 (b), but it did not explain its reasoning underlying this conclusion or on which Rule 404 (b) purpose it was relying. Nor does it appear that the court conducted the required three-part test in determining the admissibility of this evidence.

29

The trial court in the first instance, rather than this Court in retrospect, must determine the relevance of the other acts evidence and conduct the three-part admissibility test for purposes of Rule 404 (b). See id. at 418 (2) (a) (explaining that the "trial court in the first instance, rather than the appellate court in retrospect, must articulate reasons why Rule 404 (b) evidence is relevant," and remanding the case for the trial court to reanalyze the admissibility of the evidence under the 404 (b) test) (citation and punctuation omitted); see also *State v. Jones*, 297 Ga. 156, 163 (3) (773 SE2d 170) (2015) ("[A] trial court must undertake in each case a considered evaluation of the proffered justification for the admission of such evidence and make an independent determination of whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.") (citation and punctuation omitted). Accordingly, we reverse the reviewing court's ruling that the other acts evidence was otherwise admissible under Rule 404 (b).

We typically would remand the case in situations like this for the trial court to conduct the Rule 404 (b) test. See *Atkins*, 304 Ga. at 418 (2). However, we find that remanding this case for the trial court to decide the isolated issue of whether the other

acts evidence is admissible under Rule 404 (b) would be an inefficient use of judicial resources given that we are affirming the grant of a new trial (and this issue can be adequately addressed at the new trial). Consequently, if the State seeks to admit this other acts evidence at Parks's new trial, at that time, the trial court should determine whether this evidence is admissible under Rule 404 (b). In making that determination, the trial court should identify a qualified purpose for which the evidence is admitted under Rule 404 (b). Additionally, the trial court must apply the three-part test for admissibility of other acts evidence.

In light of the foregoing, we affirm in part the order granting a new trial, and we reverse in part.

*Judgment affirmed in part, and reversed in part. Dillard, C. J., and Hodges, J., concur.*